CULPEPPER IP, LLLC
Kerry S. Culpepper, Bar No. 9837
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:  (808) 464-4047
Facsimile:   (202) 204-5181
E-Mail:       kculpepper@culpepperip.com

Attorney for Plaintiff
HB Productions, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HB Productions, Inc., | **Case No.: 1:19-cv-389-ACK-KJM** |
| | (Copyright) |
| Plaintiff, | |
| vs. | **FIRST AMENDED COMPLAINT;** |
| | **EXHIBITS 1-2; DECLARATION** |
| Senthil Vijay Segaran, Noa Lum, | **OF STEPHANIE KESSNER** |
| Jacob Vela, Michael Lyons, Bryan | |
| Namba, Michael Limahai, Paul | **(1) CONTRIBUTORY** |
| Wong, Chelsie Fletcher, Jessica | **COPYRIGHT** |
| Beltran, Jericson Pastor, Matthew | **INFRINGEMENT** |
| Cox, Angeline Craythorn, Jeremy | **(2) INTENTIONAL** |
| Levien, Kenneth Evans, and | **INDUCEMENT** |
| Terry Thomas, | **(3) DIRECT COPYRIGHT** |
| | **INFRINGEMENT** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff HB Productions, Inc. ("Plaintiff") files this First Amended Complaint

against Defendants Senthil Vijay Segaran, Noa Lum, Jacob Vela, Michael Lyons,

Bryan Namba, Michael Limahai, Paul Wong, Chelsie Fletcher, Jessica Beltran,

Jericson Pastor, Matthew Cox, Angeline Craythorn, Jermey Levien, Kenneth Evans

20-018A

and Terry Thomas (sometimes referred to collectively as "Defendants") and alleges as follows:

## I.      NATURE OF THE ACTION

1.      Plaintiff brings this action to stop the massive piracy of its motion picture *Hellboy* brought on by websites under the collective names YTS and their users.

2.      To halt Defendants' illegal activities, Plaintiff brings this action under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act") and alleges that Defendants are liable for inducement, and direct and contributory copyright infringement in violation of 17 U.S.C. §§ 106 and 501.

## II.      JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

4.      Defendants solicit, transact, or are doing business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.

5.      Previously identified as JOHN DOE, Defendant Senthil Vijay Segaran ("Defendant Segaran") causes harm to Plaintiff's business within this District by

20-018A

diverting customers in this District to unauthorized Internet-based content distribution services through, at least, the interactive websites branded under the name "YTS", particularly yts.lt.

6.     Defendant Segaran has designed his interactive websites to individually target Hawaii users based upon their personal information such as web browsing history.

7.     Defendant Segaran collects log files including the Internet Protocol ("IP") address, Internet Service Provider ("ISP") and browser type of each user who visits their interactive websites.

8.     Upon information and belief, Defendant Segaran used cookies and web beacons to store information such as personal preferences of users who visit his websites.



9.     Upon information and belief, Defendant Segaran obtains financial

20-018A

benefit from their users in Hawaii via third party advertisements such as Google through the Google AdSense program.

10.     Upon information and belief, Defendant Segaran uses the cookies, log files and/or web beacons to narrowly tailor the website viewing experience to the geolocation of the user.  Particularly, users in Hawaii receive advertisements based upon their location and websites they have previously visited.



11.     Particularly, Defendant Segaran encourages his users to register an account with YTS to post comments, make requests for more pirated content and block the advertisements.

20-018A



12.     In the alternative, the Court has jurisdiction of Defendant Segaran pursuant to Fed. R. Civ. P. 4(k)(2), the so-called federal long-arm statute, for at least the following reasons: (1) Plaintiff's claims arise under federal law; (2) the Defendant Segaran purposely directed his electronic activity into the United States and target and attract a substantial number of users in the United States and, more particularly, this District; (3) Defendant Segaran does so with the manifest intent of engaging in business or other interactions with the United States; (4) Defendant Segaran is not subject to jurisdiction in any state's courts of general jurisdiction; and (5) exercising jurisdiction is consistent with the United States Constitution and laws.

13.     Defendant Segaran uses or has used many United States based sources for operating its interactive websites such as the Internet hosting and nameserver company Cloudflare, Inc. (California), the Internet server companies Digital Ocean, Inc. (New York), Level 3 Communications, Inc. (Colorado), Digital Management

20-018A

Partners, LLC dba GigeNET (Illinois), QuadraNet, Inc. (California), and Hurricane Electric Internet Services (California).

14.     Defendant Segaran further uses the Virtual Private Network ("VPN") provider London Trust Media (Colorado) and even The Onion Router ("TOR") exit relays of the US Naval Research Labs in Washington, DC to conceal login records to their Cloudflare account when operating the interactive websites.

15.     Defendant Segaran used the so-called tunneling service of Hurricane Electric Internet service to tunnel its true IPv4 address to an IPv6 address, thereby adding a further layer of subterfuge to conceal their true identity when logging onto their Cloudflare account.

16.      Defendant Segaran promotes overwhelmingly if not exclusively motion pictures produced by United States companies on their interactive websites.

17.     Defendant Segaran promotes Plaintiff's motion picture prominently on their website to attract new users.

20-018A



18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; and (c)(3) any of the Defendants not a resident of the United States may be sued in this District.

### III.   PARTIES

### A.   The Plaintiff

19.     The Plaintiff is a corporation organized and existing under the laws of the State of Nevada.   The Plaintiff has its principal offices in Los Angeles, California.

20.     Plaintiff is the owner of the copyright for the motion picture in the Work "*Hellboy*", (hereafter: the "Work") a major motion picture released in 2018.

21.     The Work is an action movie starring David Harbour, Milla Jovovich,

20-018A

IanMcShane.  The Work tells the story of a legendary half-demon superhero called to the English countryside to battle a trio of rampaging giants where he suddenly becomes caught in a clash between the supernatural and the human.

22.   The Plaintiff is an affiliate of Millennium Media, a production company and distributor of a notable catalog of major motion pictures, including, among others, *Rambo, The Expendables, Olympus Has Fallen* and *London Has Fallen*. *See* www.millenniumfilms.com.

### B.   The Defendants

23.   Defendant Segaran operates an interactive website http://yts.lt (hereafter: "YTS website") which includes a library of torrent files for copyright protected motion pictures, including Plaintiff's.  The torrent files can be used by a BitTorrent client application to download motion pictures for free.   Upon information and belief, Defendant Segaran previously operated the websites yts.ag and yts.am which all now redirect to the YTS website.

24.   Upon information and belief, the name YTS mentioned in Defendant Segaran's website is an abbreviation of YIFY Torrent Solutions.  The name YIFY is derived from the name Yiftach Swery, the founder of YIFY Torrent Solutions.

25.   Defendant Segaran states on the YTS website, "Here you will be able to browse and download YIFY movies in excellent 720p, 1080p and 3D quality…"

20-018A



26.    The YTS website of Defendant Segaran is considered one of the most popular torrent sites in world.  *See* https://torrentfreak.com/top-10-most-popular-torrent-sites-of-2019/ [last accessed on July 19, 2019].

27.    Defendant Segaran, together with third parties that are registered users of the websites of Defendant Segaran, created the torrent files that were made available on the YTS websites.

28.    Upon information and belief, the registered users of Defendant Segaran uses a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

29.    Defendant Segaran includes the words such as [YTS.AM] or [YTS.LT] or at least the wording YTS in the titles of each of the torrent files made available

20-018A

on their website in order to enhance their reputation for the quality of its torrent files and attract users to their interactive YTS website.

30.     Techmodo Limited is a fictional entity organized under the laws of England and Wales.  Defendant Segaran is an individual, the sole shareholder of Techmodo Limited and a citizen of India and previously resided in England.

31.     As of July 19, 2019, the whois search records for the registrant of the YTS website (yts.lt) show registrant name of "TechModo Limited" at 85 Great Portland Street, First Floor, London W1W 7LT, in England.   *See* https://www.domreg.lt/en/services/whois/?search=yts.lt [Last Accessed on July 19, 2019.

20-018A



32.   Techmodo Limited was declared dissolved by the Registrar of Companies for England and Wales on April 30, 2019.  It was revived or newly

20-018A

incorporated on or around August of 2019 by Defendant Segaran.

33.   Cloudflare, Inc. provides hosting and nameserver service for the interactive websites of Defendant Segaran.

34.   A registered user of the website of Defendant Segaran logged into the website from IP address 2001:470:b07e:0:d83a:a3ff:fe5e:ca ("IPv6 address") on 2018-09-19 12:27:05.71563 UTC.   The IPv6 address belongs to the California company Hurricane Electric Internet Services ("Hurricane").

35.   Hurricane has indicated that an individual who identified himself by a verified Hotmail email address from a location in Ontario, Canada subscribed for the so-called tunneling service with Hurricane to tunnel its true IPv4 address to the IPv6 address of Hurricane.

36.   Hurricane indicates that the true IPv4 address is 24.36.252.95.

37.   Publicly available information indicates that the IPv4 address 24.36.252.95 belongs to the Canadian Internet Service Provider Cogeco Cable Canada Inc. in Ontario.

38.   Upon information and belief, the subscriber at IPv4 address 24.36.252.95 in Ontario, Canada is at least one of the operators of the YTS website.

39.   The operators of the website used an email address associated with the US Company Microsoft to register for the service via the IPv4 tunneling service.

40.   Previously identified as DOES 1-6,  8-11, 14, and 16-17, Defendants

20-018A

Noa Lum, Jacob Vela, Michael Lyons, Bryan Namba, Michael Limahai, Paul Wong, Chelsie Fletcher, Jessica Beltran, Jericson Pastor, Matthew Cox, Angeline Craythorn, Kenneth Evans, and Terry Thomas ("Defendants YTS users") are users of the interactive websites of Defendant Segaran.

41.     The Defendants YTS users are members of a group of BitTorrent users or peers whose computers are collectively interconnected for the sharing of a particular unique file, otherwise known as a "swarm".   The particular file a BitTorrent swarm is associated with has a unique "hash" number, which in this case is:  SHA1:  E1F8020C12028A1C9AC791E790FDC53F3F65A3E4  (the "Unique Hash Number").   The file name is Hellboy (2019) [WEBRip] [1080p] [YTS.LT].

42.     Upon information and believe, Each of the Defendants YTS users resides in Hawaii and received from Plaintiff's agent at least a first notice per 17 U.S.C. 512(a) of the Digital Millennium Copyright Act ("DMCA notice") requesting the individual to stop infringement of the Work or other Works via BitTorrent protocol.

43.     Charter Communications LLC dba Spectrum ("Spectrum") provides the Internet service for Defendants YTS users.   Spectrum provided the subscriber identities of the Internet Protocol addresses associated with the Defendants YTS users.

## IV.   JOINDER

13

44.     Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants was properly joined because, as set forth in more detail below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the distribution of the torrent file associated with Plaintiff's Work via the YTS website of Defendant Segaran to Defendants YTS users; (ii) the inducement by Defendant Segaran of the direct infringements of Defendants YTS users; and (iii) the infringement complained of herein by each of the Defendants was part of a series of transactions over the course of a relatively short period of time, involving the exact same piece of the Plaintiff's copyrighted Work, and was accomplished by the Defendants acting in concert with each other; and (b) there are common questions of law and fact.

## V.     FACTUAL BACKGROUND

### A.  *The Plaintiff Owns the Copyright to the Work*

45.     The Plaintiff is the owner of the copyright in the Work.  The Work is the subject of a copyright registration, and this action is brought pursuant to 17 U.S.C. § 411.  *See* Exhibit "2".

46.     The Work is a motion picture currently offered for sale in commerce.

47.     Defendants had notice of Plaintiff's rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

48.     Defendants also had notice of Plaintiff's rights through general

publication and advertising associated with the motion picture, and packaging and copies, each of which bore a proper copyright notice.

### B. Defendants Used BitTorrent To Infringe the Plaintiff's Copyright

49.    BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

50.    The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

### 1. Defendants YTS users installed a BitTorrent Client onto his or her Computer

51.    A BitTorrent Client is a software program that implements the BitTorrent Protocol.  There are numerous such software programs which can be directly downloaded from the Internet.

52.    Once installed on a computer, the BitTorrent Client serves as the user's

interface during the process of uploading and downloading data using the BitTorrent protocol.

53.     Defendants YTS users installed a BitTorrent Client onto their respective computer.

### 2. The Initial Seed, Torrent, Hash and Tracker

54.     A BitTorrent user that wants to upload a new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

55.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

56.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Work, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

57.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

58.     Torrent files also have an "announce" section, which specifies the URL

(Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

59.    The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

60.    The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

61.    Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

### 3. Torrent Sites

62.    "Torrent sites", such as the website YTS of the Defendant Segaran, are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.   There are numerous torrent websites.

63.    Upon information and belief, Defendants went to a torrent site to upload and download Plaintiff's copyrighted Work.

17

20-018A

64.     Upon information and belief, each of Defendants YTS users went to the torrent site YTS of Defendant Segaran to download Plaintiff's copyrighted Work.

### 4. Uploading and Downloading a Work Through a BitTorrent Swarm

65.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

66.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.

67.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.

68.     In this way, all of the peers and seeders are working together in what is called a "swarm."

69.     Here, Defendants participated in the same swarm and directly interacted and communicated with other members of that swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions.

70.     In this way, and by way of example only, one initial seeder can create

20-018A

a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Work here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

71.    Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

### 5. The Plaintiff's Computer Investigator Identified the Defendants YTS users' IP Addresses as Participants in a Swarm That Was Distributing the Plaintiff's Copyrighted Work

72.    The Plaintiff retained Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiff's copyrighted Work.

73.    MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

74.    MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses

20-018A

associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

75.     The IP addresses, Unique Hash Number, and hit dates contained on Exhibit "1" accurately reflect what is contained in the evidence logs, and show that Defendants YTS users have copied a piece of the Plaintiff's copyrighted Work identified by the Unique Hash Number.

76.     The Defendants YTS users' computers used the identified IP address to connect to the investigative server from a computer in this District in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

77.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP address listed on Exhibit 1 and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Work.

78.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

### C. A Registered User of the website of Defendant Segaran is the initial Seeder of the Work

79.     A registered user of the website of Defendant Segaran was the initial seeder who copied the Work and together with the Defendant Segaran created the

torrent file "Hellboy (2019) [WEBRip] [1080p] [YTS.LT]".  Exhibit "1".

80.    Accordingly, Defendant Segaran is the initial contributor and create of the Swarm identified by the Unique Hash Number.

81.    Defendant Segaran does not have a license from Plaintiff to copy Plaintiff's Work.

### D. Defendant Segaran distributed the torrent file of the Work

82.    Defendant Segaran made the torrent file "Hellboy (2019) [WEBRip] [1080p] [YTS.LT]" available to users in Hawaii such as Defendants YTS users, the United States and the entire World to download from his interactive YTS website.

83.    Defendant Segaran did not have a license from Plaintiff to distribute copies of Plaintiff's Work.

### E. Defendant Segaran induce infringements of the Work

84.    Users of the Defendant Segaran's interactive website use the website for its intended and unquestionably infringing purposes, most notably to obtain immediate, unrestricted, and unauthorized access to unauthorized copies of Plaintiff's Copyrighted Work.

85.    Defendant Segaran promotes his website for overwhelmingly, if not exclusively, infringing purposes, and that is how the users use the websites.

86.    The commercial value of Defendant Segaran's website depends on high-volume use of unauthorized content through the website. Defendant Segaran

20-018A

promises his users reliable and convenient access to all the content they can watch and users visit the websites based on Defendant Segaran's apparent success in delivering infringing content to its customers.

## VI. FIRST CLAIM FOR RELIEF
### (Intentional Inducement – Against Defendant Segaran)

87.    Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

88.    Plaintiff is the copyright owner of the Work which contains an original work of authorship.

89.    Defendant Segaran had actual knowledge of third parties' infringement of Plaintiff's exclusive rights under the Copyright Act.

90.    Defendant Segaran intentionally induced the infringement of Plaintiff's exclusive rights under the Copyright Act, including infringement of Plaintiff's exclusive right to publicly distribute copies of Copyrighted Works.

91.    As intended and encouraged by Defendant Segaran, the website provides torrent files that connect users to Torrent sources and/or sites that deliver copies of Plaintiff's Copyrighted Works.  The operators of these Torrent sources directly infringe Plaintiff's exclusive rights by providing unauthorized copies of the works to the public, including to users of Defendant Segaran's website.

92.    Once the user of Defendant Segaran's website has obtained a complete

copy of the Plaintiff's Copyrighted Works, that particular user also becomes another Torrent source that delivers copies of Plaintiff's Copyrighted Works.

93.     Defendant Segaran induces the aforementioned acts of infringement by supplying the torrent file that facilitates, enables, and creates direct links between its users and the infringing Torrent source, and by actively inducing, encouraging and promoting the use of the website for blatant copyright infringement.

94.     Defendant Segaran's intentional inducement of the infringement of Plaintiff's rights in its Copyrighted Work constitutes a separate and distinct act of infringement.

95.     Defendant Segaran's inducement of the infringement of Plaintiff's Copyrighted Work is willful, intentional, and purposeful, and in disregard of and with indifference to the rights of Plaintiff.

96.     Defendant Segaran's actions are a direct and proximate cause of the infringements of Plaintiff's Work.

## VII. SECOND CLAIM FOR RELIEF
### (Contributory Copyright Infringement based upon Material Contribution – Against Defendant Segaran)

97.     Plaintiff re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

98.     Defendant Segaran had actual or constructive knowledge of infringement of Plaintiff's exclusive rights under the Copyright Act.   Defendant

20-018A

Segaran knowingly and materially contributes to such infringing activity.

99.     Defendant   Segaran   knowingly   and   materially   contribute   to   the
infringement   of   Plaintiff's   exclusive   rights   under   the   Copyright   Act,   including
infringement of Plaintiff's exclusive right to distribute the Work. Defendant Segaran
design and promote the use of the YTS website to provide torrent files that connect
customers to unauthorized online torrent sources to download copies of Plaintiff's
Copyrighted   Work.     The   operators   of   these   torrent   sources   directly   infringe
Plaintiff's   distribution   rights   by   providing   copies   of   the   Work   to   the   public,
including to YTS website users. The operators, or others operating in concert with
them, control the facilities and equipment used to store and deliver copies of the
content, and they actively and directly cause the content to be distributed when users
run the torrent file obtained from the YTS website.

100.   Defendant   Segaran   knowingly   and   materially   contributes   to   the
aforementioned   acts   of   infringement   by   supplying   the   website   that   facilitates,
encourages, enables, and creates direct links between website users and infringing
operators   of   the   Torrent   services,   and   by   actively   encouraging,   promoting,   and
contributing to the use of the website for blatant copyright infringement.

101.   Defendant   Segaran's   knowing   and   material   contribution   to   the
infringement of Plaintiff's rights in the Copyrighted Work constitutes a separate and
distinct act of infringement.

20-018A

102.   Defendant Segaran's knowing and material contribution to the infringement of Plaintiff's Copyrighted Work is willful, intentional, and purposeful, and in disregard of and with indifference to the rights of Plaintiff.

103.   As a direct and proximate result of the infringement to which Defendant Segaran knowingly and materially contributes, Plaintiff is entitled to damages and Defendant Segaran's profits in amounts to be proven at trial.

104.   Defendant Segaran obtained a direct financial interest, financial advantage, and/or economic consideration from the infringements in Hawaii as a result of their infringing actions in the United States.

105.   Defendant Segaran's actions are a direct and proximate cause of the infringements of Plaintiff's Work.

## VIII. THIRD CLAIM FOR RELIEF
### (Contributory Copyright Infringement against all Defendants based upon participation in the BitTorrent Swarm)

106.   Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

107.   By participating in the BitTorrent swarm with others, Defendants induced, caused or materially contributed to the infringing conduct of others.

108.   Plaintiffs did not authorize, permit, or provide consent to the Defendants inducing, causing, or materially contributing to the infringing conduct of others.

25

20-018A

109.   Defendants knew or should have known that the other BitTorrent users in a swarm with it were directly infringing the Plaintiff's copyrighted Work by copying constituent elements of the registered Work that are original.   Indeed, Defendants directly participated in and therefore materially contributed to others' infringing activities.

110.   The Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

111.   By engaging in the contributory infringement alleged in this Complaint, the Defendants deprived not only the producer of the Work from income that could have been derived when this film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets in Hawai'i and their employees, and, ultimately, the local economy.   The Defendants' misconduct therefore offends public policy.

112.   The Plaintiff has suffered damages that were proximately caused by the Defendants' contributory copyright infringement including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

## IX. FOURTH CLAIM FOR RELIEF
### (Direct Copyright Infringement against all Defendants)

113.   Plaintiff re-alleges and incorporates by reference the allegations contained in each of the foregoing paragraphs.

20-018A

114.    Plaintiff is the copyright owner of the Work which contains an original work of authorship.

115.    Defendant Segaran copied the constituent elements of the Work when creating the torrent file.

116.    Defendant Segaran's users copied the constituent elements of the Work.

117.    Plaintiff did not authorize, permit, or provide consent to Defendants to copy, reproduce, redistribute, perform, or display their Works.

118.    As a result of the foregoing, Defendants violated the Plaintiff's exclusive right to: (A) Reproduce the Work in copies, in violation of 17 U.S.C. §§ 106(1) and 501; (B) Redistribute copies of the Work to the public by sale or other transfer of ownership, or by rental, lease or lending, in violation of 17 U.S.C. §§ 106(3) and 501; (C) Perform the copyrighted Work, in violation of 17 U.S.C. §§ 106(4) and 501, by showing the Work's images; and, (D) Display the copyrighted Work, in violation of 17 U.S.C. §§ 106(5) and 501, by showing individual images of the Work non-sequentially and transmitting said display of the Work by means of a device or process to members of the public capable of receiving the display (as set forth in 17 U.S.C. § 101's definition of "publicly" display.)

119.    Each of the Defendants' infringements was committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

20-018A

120.   The Plaintiffs have suffered damages that were proximately caused by each of the Defendants' copyright infringements including, but not limited to lost sales, price erosion, and a diminution of the value of its copyright.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court:

(A) enter temporary, preliminary and permanent injunctions enjoining each Defendant from continuing to directly infringe and contribute to infringement of the Plaintiffs' copyrighted Works;

(B) Entry of an Order pursuant to 17 U.S.C. §512(j) and/or 28 U.S.C §1651(a) that, Cloudflare and any other service provider cease providing service for the website: (i) yts.lt; and (iii) any mirror websites in concert with yts.lt such as, but not limited to yts.am and yts.ag, immediately cease said service;

(C) that, upon Plaintiff's request, those in privity with Defendants and those with notice of the injunction, including any Internet search engines, Web hosts, domain-name registrars, and domain name registries and/or their administrators that are provided with notice of the injunction, cease facilitating access to any or all domain names and websites through which Defendants engage in the aforementioned infringements;

(D) award the Plaintiff's actual damages and Defendants' profits in such amount as may be found; alternatively, at Plaintiff's election, for maximum statutory

20-018A

damages of $150,000 against Defendant Senthil Segaran, and statutory damages of $750 against each of Defendants Noa Lum, Jacob Vela, Michael Lyons, Bryan Namba, Michael Limahai, Paul Wong, Chelsie Fletcher, Jessica Beltran, Jericson Pastor, Matthew Cox, Angeline Craythorn, Jeremy Levien, Kenneth Evans, and Terry Thomas  pursuant to 17 U.S.C.  § 504-(a) and (c);

(E) award the Plaintiff its reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

(F) grant the Plaintiff any and all other and further relief that this Court deems just and proper.

The Plaintiff hereby demands a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, December 20, 2019.


CULPEPPER IP, LLLC


/s/ Kerry S. Culpepper
Kerry S. Culpepper

Attorney for Plaintiff
HB Productions, Inc.

20-018A